Justice Blackmun,
with whom Justice Brennan, Justice Marshall, and Justice O’Connor join, concurring in part and dissenting in part.
Some might well regard the Court’s decision in this case as an affront to the nations that have joined the United States in ratifying the Hague Convention on the Taking of Evidence *548 Abroad in Civil or Commercial Matters, opened for signature, Mar. 18, 1970, 23 U. S. T. 2555, T. I. A. S. No. 7444. The Court ignores the importance of the Convention by relegating it to an “optional” status, without acknowledging the significant achievement in accommodating divergent interests that the Convention represents. Experience to date indicates that there is a large risk that the case-by-case comity analysis now to be permitted by the Court will be performed inadequately and that the somewhat unfamiliar procedures of the Convention will be invoked infrequently. I fear the Court’s decision means that courts will resort unnecessarily to issuing discovery orders under the Federal Rules of Civil Procedure in a raw exercise of their jurisdictional power to the detriment of the United States’ national and international interests. The Court’s view of this country’s international obligations is particularly unfortunate in a world in which regular commercial and legal channels loom ever more crucial.
I do agree with the Court’s repudiation of the positions at both extremes of the spectrum with regard to the use of the Convention. Its rejection of the view that the Convention is not “applicable” at all to this case is surely correct: the Convention clearly applies to litigants as well as to third parties, and to requests for evidence located abroad, no matter where that evidence is actually “produced.” The Court also correctly rejects the far opposite position that the Convention provides the exclusive means for discovery involving signatory countries. I dissent, however, because I cannot endorse the Court’s case-by-case inquiry for determining whether to use Convention procedures and its failure to provide lower courts with any meaningful guidance for carrying out that inquiry. In my view, the Convention provides effective discovery procedures that largely eliminate the conflicts between United States and foreign law on evidence gathering. I therefore would apply a general presumption that, in most cases, courts should resort first to the Conven *549 tion procedures.[1] An individualized analysis of the circumstances of a particular case is appropriate only when it appears that it would be futile to employ the Convention or when its procedures prove to be unhelpful.
I
Even though the Convention does not expressly require discovery of materials in foreign countries to proceed exclusively according to its procedures, it cannot be viewed as merely advisory. The Convention was drafted at the request and with the enthusiastic participation of the United States, which sought to broaden the techniques available for the taking of evidence abroad. The differences between discovery practices in the United States and those in other countries are significant, and “[n]o aspect of the extension of the American legal system beyond the territorial frontier of the United States has given rise to so much friction as the request for documents associated with investigation and litigation in the United States.” Restatement of Foreign Relations Law of the United States (Revised) § 437, Reporters’ Note 1, p. 35 (Tent. Draft No. 7, Apr. 10, 1986). Of par *550 ticular import is the fact that discovery conducted by the parties, as is common in the United States, is alien to the legal systems of civil-law nations, which typically regard evidence gathering as a judicial function.
The Convention furthers important United States interests by providing channels for discovery abroad that would not be available otherwise. In general, it establishes “methods to reconcile the differing legal philosophies of the Civil Law, Common Law and other systems with respect to the taking of evidence.” Rapport de la Commission spéciale, 4 Conférence de La Haye de droit international privé: Actes et documents de la Onziéme session 55 (1970) (Actes et documents). It serves the interests of both requesting and receiving countries by advancing the following goals:
“[T]he techniques for the taking of evidence must be ‘utilizable’ in the eyes of the State where the lawsuit is pending and must also be ‘tolerable’ in the eyes of the State where the evidence is to be taken.” Id., at 56.
The Convention also serves the long-term interests of the United States in helping to further and to maintain the climate of cooperation and goodwill necessary to the functioning of the international legal and commercial systems.
It is not at all satisfactory to view the Convention as nothing more than an optional supplement to the Federal Rules of Civil Procedure, useful as a means to “facilitate discovery” when a court “deems that course of action appropriate.” Ante, at 533. Unless they had expected the Convention to provide the normal channels for discovery, other parties to the Convention would have had no incentive to agree to its terms. The civil-law nations committed themselves to employ more effective procedures for gathering evidence within their borders, even to the extent of requiring some common-law practices alien to their systems. At the time of the Convention’s enactment, the liberal American policy, which allowed foreigners to collect evidence with ease in the United States, see ante at 529-530, and n. 13, was in place and, be *551 cause it was not conditioned on reciprocity, there was little likelihood that the policy would change as a result of treaty negotiations. As a result, the primary benefit the other signatory nations would have expected in return for their concessions was that the United States would respect their territorial sovereignty by using the Convention procedures.[2]
H — ¶ h-H
By viewing the Convention as merely optional and leaving the decision whether to apply it to the court in each individual case, the majority ignores the policies established by the political branches when they negotiated and ratified the treaty. The result will be á duplicative analysis for which courts are not well designed. The discovery process usually concerns discrete interests that a court is well equipped to accommodate — the interests of the parties before the court coupled with the interest of the judicial system in resolving the conflict on the basis of the best available information. When a lawsuit requires discovery of materials located in a foreign nation, however, foreign legal systems and foreign interests *552 are implicated as well. The presence of these interests creates a tension between the broad discretion our courts normally exercise in managing pretrial discovery and the discretion usually allotted to the Executive in foreign matters.
It is the Executive that normally decides when a course of action is important enough to risk affronting a foreign nation or placing a strain on foreign commerce. It is the Executive, as well, that is best equipped to determine how to accommodate foreign interests along with our own.[3] Unlike the courts, “diplomatic and executive channels are, by definition, designed to exchange, negotiate, and reconcile the problems which accompany the realization of national interests within the sphere of international association.” Laker Airways, Ltd. v. Sabena, Belgian World Airlines, 235 U. S. App. D. C. 207, 253, 731 F. 2d 909, 955 (1984). The Convention embodies the result of the best efforts of the Executive Branch, in negotiating the treaty, and the Legislative Branch, in ratifying it, to balance competing national interests. As such, the Convention represents a political determination — one that, consistent with the principle of separation of powers, courts should not attempt to second-guess.
Not only is the question of foreign discovery more appropriately considered by the Executive and Congress, but in addition, courts are generally ill equipped to assume the role of balancing the interests of foreign nations with that of our own. Although transnational litigation is increasing, relatively few judges are experienced in the area and the procedures of foreign legal systems are often poorly understood. Wilkey, Transnational Adjudication: A View from the Bench, 18 Int’l Lawyer 541, 543 (1984); Ristau, Overview of Interna *553 tional Judicial Assistance, 18 Int’l Lawyer 525, 531 (1984). As this Court recently stated, it has “little competence in determining precisely when foreign nations will be offended by particular acts.” Container Corp. v. Franchise Tax Bd., 463 U. S. 159, 194 (1983). A pro-forum bias is likely to creep into the supposedly neutral balancing process[4] and courts not surprisingly often will turn to the more familiar procedures established by their local rules. In addition, it simply is not reasonable to expect the Federal Government or the foreign state in which the discovery will take place to participate in every individual case in order to articulate the broader international and foreign interests that are relevant *554 to the decision whether to use the Convention. Indeed, the opportunities for such participation are limited.[5] Exacerbating these shortcomings is the limited appellate review of interlocutory discovery decisions,[6] which prevents any effective case-by-case correction of erroneous discovery decisions.
I — I I — I hH
The principle of comity leads to more definite rules than the ad hoc approach endorsed by the majority. The Court asserts that the concept of comity requires an individualized analysis of the interests present in each particular case before a court decides whether to apply the Convention. See ante, at 543-544. There is, however, nothing inherent in the comity principle that requires case-by-case analysis. The Court frequently has relied upon a comity analysis when it has adopted general rules to cover recurring situations in areas such as choice of forum,[7] maritime law,[8] and sovereign *555 immunity,[9] and the Court offers no reasons for abandoning that approach here.
Comity is not just a vague political concern favoring international cooperation when it is in our interest to do so. Rather it is a principle under which judicial decisions reflect the systemic value of reciprocal tolerance and goodwill. See Maier, Extraterritorial Jurisdiction at a Crossroads: An Intersection Between Public and International Law, 76 Am. J. Int’l L. 280, 281-285 (1982); J. Story, Commentaries on the Conflict of Laws §§35, 38 (8th ed. 1883).[10] As in the choice-of-law analysis, which from the very beginning has been linked to international comity, the threshold question in a comity analysis is whether there is in fact a true conflict between domestic and foreign law. When there is a conflict, a court should seek a reasonable accommodation that reconciles the central concerns of both sets of laws. In doing so, it should perform a tripartite analysis that considers the foreign interests, the interests of the United States, and the mutual interests of all nations in a smoothly functioning international legal regime.[11]
*556 In most cases in which a discovery request concerns a nation that has ratified the Convention there is no need to resort to comity principles; the conflicts they are designed to resolve already have been eliminated by the agreements expressed in the treaty. The analysis set forth in the Restatement (Revised) of Foreign Relations Law of the United States, see ante, at 544, n. 28, is perfectly appropriate for courts to use when no treaty has been negotiated to accommodate the different legal systems. It would also be appropriate if the Convention failed to resolve the conflict in a particular case. The Court, however, adds an additional layer of so-called comity analysis by holding that courts should determine on a case-by-case basis whether resort to the Convention is desirable. Although this analysis is unnecessary in the absence of any conflicts, it should lead courts to the use of the Convention if they recognize that the Convention already has largely accommodated all three categories of interests relevant'to a comity analysis — foreign interests, domestic interests, and the interest in a well-functioning international order.
A
I am encouraged by the extent to which the Court emphasizes the importance of foreign interests and by its admonition to lower courts -to take special care to respect those interests. See ante, at 546. Nonetheless, the Court’s view of the Convention rests on an incomplete analysis of the sovereign interests of foreign states. The Court acknowledges that evidence is normally obtained in civil-law countries by a judicial officer, ante, at 543, but it fails to recognize the significance of that practice. Under the classic view of territo *557 rial sovereignty, each state has a monopoly on the exercise of governmental power within its borders and no state may perform an act in the territory of a foreign state without consent.[12] As explained in the Report of United States Delegation to Eleventh Session of the Hague Conference on Private International Law, the taking of evidence in a civil-law country may constitute the performance of a public judicial act by an unauthorized foreign person:
“In drafting the Convention, the doctrine of ‘judicial sovereignty’ had to be constantly borne in mind. Unlike the common-law practice, which places upon the parties to the litigation the duty of privately securing and presenting the evidence at the trial, the civil law considers obtaining of evidence a matter primarily for the courts, with the parties in the subordinate position of assisting the judicial authorities.
“The act of taking evidence in a common-law country from a willing witness, without compulsion and without a breach of the peace, in aid of a foreign proceeding, is a purely private matter, in which the host country has no interest and in which its judicial authorities have normally no wish to participate. To the contrary, the same act in a civil-law country may be a public matter, and may constitute the performance of a public judicial act by an unauthorized foreign person. It may violate the *558 ‘judicial sovereignty’ of the host country, unless its authorities participate or give their consent.” 8 Int’l Legal Materials 785, 806 (1969).[13]
Some countries also believe that the need to protect certain underlying substantive rights requires judicial control of the taking of evidence. In the Federal Republic of Germany, for example, there is a constitutional principle of proportionality, pursuant to which a judge must protect personal privacy, commercial property, and business secrets. Interference with these rights is proper only if “necessary to protect other persons’ rights in the course of civil litigation.” See Meessen, The International Law on Taking Evidence From, Not In, a Foreign State, The Anschutz and Messerschmitt opinions of the United States Court of Appeals for the Fifth Circuit (Mar. 31, 1986),' as set forth in App. to Brief for Anschuetz & Co. GmbH and Messerschmitt-Boelkow-Blohm GmbH as Amici Curiae 27a-28a.[14]
*559 The United States recently recognized the importance of these sovereignty principles by taking the broad position that the Convention “must be interpreted to preclude an evidence taking proceeding in the territory of a foreign state party if the Convention does not authorize it and the host country does not otherwise permit it.” Brief for United States as Amicus Curiae in Volkswagenwerk Aktiengesellschaft v. Falzon, O. T. 1983, No. 82-1888, p. 6. Now, however, it appears to take a narrower view of what constitutes an “evidence taking procedure,” merely stating that “oral depositions on foreign soil. . . are improper without the consent of the foreign nation.” Tr. of Oral Arg. 23. I am at a loss to understand why gathering documents or information in a foreign country, even if for ultimate production in the United States, is any less an imposition on sovereignty than the taking of a deposition when gathering documents also is regarded as a judicial function in a civil-law nation.
Use of the Convention advances the sovereign interests of foreign nations because they have given consent to Convention procedures by ratifying them. This consent encompasses discovery techniques that would otherwise impinge on the sovereign interests of many civil-law nations. In the absence of the Convention, the informal techniques provided by Articles 15-22 of the Convention — taking evidence by a diplomatic or consular officer of the requesting state and the use of commissioners nominated by the court of the state where the action is pending — would raise sovereignty issues similar to those implicated by a direct discovery order from a foreign court. “Judicial” activities are occurring on the soil of the sovereign by agents of a foreign state.[15] These voluntary discovery procedures are a great boon to United States liti *560 gants and are used far more frequently in practice than is compulsory discovery pursuant to letters of request.[16]
Civil-law contracting parties have also agreed to use, and even to compel, procedures for gathering evidence that are diametrically opposed to civil-law practices. The civil-law system is inquisitional rather than adversarial and the judge normally questions the witness and prepares a written summary of the evidence.[17] Even in common-law countries no system of evidence-gathering resembles that of the United States.[18] Under Article 9 of the Convention, however, a foreign court must grant a request to use a “special method or procedure,” which includes requests to compel attendance of *561 witnesses abroad, to administer oaths, to produce verbatim transcripts, or to permit examination of witnesses by counsel for both parties.[19] These methods for obtaining evidence, which largely eliminate conflicts between the discovery procedures of the United States and the laws of foreign systems, have the consent of the ratifying nations. The use of these methods thus furthers foreign interests because discovery can proceed without violating the sovereignty of foreign nations.
B
The primary interest of the United States in this context is in providing effective procedures to enable litigants to obtain evidence abroad. This was the very purpose of the United States’ participation in the treaty negotiations and, for the most part, the Convention provides those procedures.
The Court asserts that the letters of request procedure authorized by the Convention in many situations will be “unduly time consuming and expensive.” Ante, at 542. The Court offers no support for this statement and until the Convention is used extensively enough for courts to develop experience with it, such statements can be nothing other than speculation.[20] Conspicuously absent from the Court’s assess *562 ment is any consideration of resort to the Convention’s less formal and less time-consuming alternatives — discovery conducted by consular officials or an appointed commissioner. Moreover, unless the costs become prohibitive, saving time and money is not such a high priority in discovery that some additional burden cannot be tolerated in the interest of international goodwill. Certainly discovery controlled by litigants under the Federal Rules of Civil Procedure is not known for placing a high premium on either speed or cost-effectiveness.
There is also apprehension that the Convention procedures will not prove fruitful. Experience with the Convention suggests otherwise — contracting parties have honored their obligation to execute letters of request expeditiously and to use compulsion if necessary. See, e. g., Report on the Work of the Special Commission on the Operation of the Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters, 17 Int’l Legal Materials 1425, 1431, § 5 F (1978) (“[r]efusal to execute turns out to be very infre *563 quent in practice”). By and large, the concessions made by parties to the Convention not only provide United States litigants with a means for obtaining evidence, but also ensure that the evidence will be in a form admissible in court.
There are, however, some situations in which there is legitimate concern that certain documents cannot be made available under Convention procedures. Thirteen nations have made official declarations pursuant to Article 23 of the Convention, which permits a contracting state to limit its obligation to produce documents in response to a letter of request. See ante, at 536, n. 21. These reservations may pose problems that would require a comity analysis in an individual case, but they are not so all-encompassing as the majority implies — they certainly do not mean that a “contracting party could unilaterally abrogate . . . the Convention’s procedures.” Ante, at 537. First, the reservations can apply only to letters of request for documents. Thus, an Article 23 reservation affects neither the most commonly used informal Convention procedures for taking of evidence by a consul or a commissioner nor formal requests for depositions or interrogatories. Second, although Article 23 refers broadly to “pretrial discovery,” the intended meaning of the term appears to have been much narrower than the normal United States usage.[21] The contracting parties for the most part have mod *564 ified the declarations made pursuant to Article 23 to limit their reach. See 7 Martindale-Hubbell Law Directory (pt. VII) 14-19 (1986).[22] Indeed, the emerging view of this exception to discovery is that it applies only to “requests that lack sufficient specificity or that have not been reviewed for *565 relevancy by the requesting court.” Oxman, The Choice Between Direct Discovery and Other Means of Obtaining Evidence Abroad: The Impact of the Hague Evidence Convention, 37 U. Miami L. Rev., at 777. Thus, in practice, a reservation is not the significant obstacle to discovery under the Convention that the broad wording of Article 23 would suggest.[23]
In this particular case, the “French ‘blocking statute,’ ” see ante, at 526, n. 6, poses an additional potential barrier to obtaining discovery from France. But any conflict posed by this legislation is easily resolved by resort to the Convention’s procedures. The French statute’s prohibitions are expressly “subject to” international agreements and applicable laws and it does not affect the taking of evidence under the Convention. See Toms, The French Response to the Extraterritorial Application of United States Antitrust Laws, 15 Int’l Lawyer 585, 593-599 (1981); Heck, Federal Republic of Germany and the EEC, 18 Int’l Lawyer 793, 800 (1984).
The second major United States interest is in fair and equal treatment of litigants. The Court cites several fairness concerns in support of its conclusion that the Convention is not exclusive and apparently fears that a broad endorsement of the use of the Convention would lead to the same “unacceptable asymmetries.” See ante, at 540, n. 25. Courts can protect against the first two concerns noted by the majority — that a foreign party to a lawsuit would have a discovery advantage over a domestic litigant because it could obtain the advantages of the Federal Rules of Civil Procedure, and that a foreign company would have an economic *566 competitive advantage because it would be subject to less extensive discovery — by exercising their discretionary powers to control discovery in order to ensure fairness to both parties. A court may “make any order which justice requires” to limit discovery, including an order permitting discovery only on specified terms and conditions, by a particular discovery method, or with limitation in scope to certain matters. Fed. Rule Civ. Proc. 26(c). If, for instance, resort to the Convention procedures would put one party at a disadvantage, any possible unfairness could be prevented by postponing that party’s obligation to respond to discovery requests until completion of the foreign discovery. Moreover, the Court’s arguments focus on the nationality of the parties, while it is actually the locus of the evidence that is relevant to use of the Convention: a foreign litigant trying to secure evidence from a foreign branch of an American litigant might also be required to resort to the Convention.
The Court’s third fairness concern is illusory. It fears that a domestic litigant suing a national of a state that is not a party to the Convention would have an advantage over a litigant suing a national of a contracting state. This statement completely ignores the very purpose of the Convention. The negotiations were proposed by the United States in order to facilitate discovery, not to hamper litigants. Dissimilar treatment of litigants similarly situated does occur, but in the manner opposite to that perceived by the Court. Those who sue nationals of noncontracting states are disadvantaged by the unavailability of the Convention procedures. This is an unavoidable inequality inherent in the benefits conferred by any treaty that is less than universally ratified.
In most instances, use of the Convention will serve to advance United States interests, particularly when those interests are viewed in a context larger than the immediate interest of the litigants’ discovery. The approach I propose is not a rigid per se rule that would require first use of the Convention without regard to strong indications that no evidence *567 would be forthcoming. All too often, however, courts have simply assumed that resort to the Convention would be unproductive and have embarked on speculation about foreign procedures and interpretations. See, e. g., International Society for Krishna Consciousness, Inc. v. Lee, 105 F. R. D. 435, 449-450 (SDNY 1984); Graco, Inc. v. Kremlin, Inc., 101 F. R. D. 503, 509-512 (ND Ill. 1984). When resort to the Convention would be futile, a court has no choice but to resort to a traditional comity analysis. But even then, an attempt to use the Convention will often be the best way to discover if it will be successful, particularly in the present state of general inexperience with the implementation of its procedures by the various contracting states. An attempt to use the Convention will open a dialogue with the authorities in the foreign state and in that way a United States court can obtain an authoritative answer as to the limits on what it can achieve with a discovery request in a particular contracting state.
C
The final component of a comity analysis is to consider if there is a course that furthers, rather than impedes, the development of an ordered international system. A functioning system for solving disputes across borders serves many values, among them predictability, fairness, ease of commercial interactions, and “stablility through satisfaction of mutual expectations.” Laker Airways, Ltd. v. Sabena, Belgian World Airlines, 235 U. S. App. D. C., at 235, 731 F. 2d, at 937. These interests are common to all nations, including the United States.
Use of the Convention would help develop methods for transnational litigation by placing officials in a position to communicate directly about conflicts that arise during discovery, thus enabling them to promote a reduction in those conflicts. In a broader framework, courts that use the Convention will avoid foreign perceptions of unfairness that result when United States courts show insensitivity to the interests *568 safeguarded by foreign legal regimes. Because of the position of the United States, economically, politically, and militarily, many countries may be reluctant to oppose discovery orders of United States courts. Foreign acquiescence to orders that ignore the Convention, however, is likely to carry a price tag of accumulating resentment, with the predictable long-term political cost that cooperation will be withheld in other matters. Use of the Convention is a simple step to take toward avoiding that unnecessary and undesirable consequence.
r — I <J
I can only hope that courts faced with discovery requests for materials in foreign countries will avoid the parochial views that too often have characterized the decisions to date. Many of the considerations that lead me to the conclusion that there should be a general presumption favoring use of the Convention should also carry force when courts analyze particular cases. The majority fails to offer guidance in this endeavor, and thus it has missed its opportunity to provide predictable and effective procedures for international litigants in United States courts. It now falls to the lower courts to recognize the needs of the international commercial system and the accommodation of those needs already endorsed by the political branches and embodied in the Convention. To the extent indicated, I respectfully dissent.

 Many courts that have examined the issue have adopted a rule of first resort to the Convention. See, e. g., Philadelphia Gear Corp. v. American Pfauter Corp. 100 F. R. D. 58, 61 (ED Pa. 1983) (“avenue of first resort for plaintiff [is] the Hague Convention”); Gebr. Eickhoff Maschinenfabrik und Eisengieberei mbH v. Starcher, - W. Va. -, ——, 328 S. E. 2d 492, 504-506 (1985) (“principle of international comity dictates first resort to [Convention] procedures”); Vincent v. Ateliers de la Motobécane, S. A., 193 N. J. Super. 716, 723, 475 A. 2d 686, 690 (App. Div. 1984) (litigant should first attempt to comply with Convention); Th. Goldschmidt A. G. v. Smith, 676 S. W. 2d 443, 445 (Tex. App. 1984) (Convention procedures not mandatory but are “avenue of first resort”); Pierburg GmbH & Co. KG v. Superior Court, 137 Cal. App. 3d 238, 247, 186 Cal. Rptr. 876, 882-883 (1982) (plaintiffs must attempt to comply with the Convention); Volkswagenwerk Aktiengesellschaft v. Superior Court, 123 Cal. App. 3d 840, 857-859, 176 Cal. Rptr. 874, 885-886 (1981) (“Hague Convention establishes not a fixed rule but rather a minimum measure of international cooperation”).

 Article 27 of the Convention, see ante, at 538, n. 24, is not to the contrary. The only logical interpretation of this Article is that a state receiving a discovery request may permit less restrictive procedures than those designated in the Convention. The majority finds plausible a reading that authorizes both a requesting and a receiving state to use methods outside the Convention. Ibid. If this were the case, Article 27(c), which allows a state to permit methods of taking evidence that are not provided in the Convention, would make the rest of the Convention wholly superfluous. If a requesting state could dictate the methods for taking evidence in another state, there would be no need for the detailed procedures provided by the Convention.
Moreover, the United States delegation’s explanatory report on the Convention describes Article 27 as “designed to preserve existing internal law and practice in a Contracting State which provides broader, more generous and less restrictive rules of international cooperation in the taking of evidence for the benefit of foreign courts and litigants.” S. Exec. Doc. A, 92d Cong., 2d Sess., 39 (1972). Article 27 authorizes the use of alternative methods for gathering evidence “if the internal law or practice of the State of execution so permits.” Id., at 39-40 (emphasis added).

 Our Government’s interests themselves are far more complicated than can be represented by the limited parties before a court. The United States is increasingly concerned, for example, with protecting sensitive technology for both economic and military reasons. It may not serve the country’s long-term interest to establish precedents that could allow foreign courts to compel production of the records of American corporations.

 One of the ways that a pro-forum bias has manifested itself is in United States courts’ preoccupation with their own power to issue discovery orders. All too often courts have regarded the Convention as some kind of threat to their jurisdiction and have rejected use of the treaty procedures. See, e. g., In re Anschuetz & Co., GmbH, 754 F. 2d 602, 606, 612 (CA5 1985), cert. pending, No. 85-98. It is well established that a court has the power to impose discovery under the Federal Rules of Civil Procedure when it has personal jurisdiction over the foreign party. Societe Internationale Pour Participations Industrielles et Commerciales, S. A. v. Rogers, 357 U. S. 197, 204-206 (1958). But once it is determined that the Convention does not provide the exclusive means for foreign discovery, jurisdictional power is not the issue. The relevant question, instead, becomes whether a court should forgo exercise of the full extent of its power to order discovery. The Convention, which is valid United States law, provides an answer to that question by establishing a strong policy in favor of self-restraint for the purpose of furthering United States interests and minimizing international disputes.
There is also a tendency on the part of courts, perhaps unrecognized, to view a dispute from a local perspective. “[Djomestic courts do not sit as internationally constituted tribunals. . . . The courts of most developed countries follow international law only to the extent it is not overridden by national law. Thus courts inherently find it difficult neutrally to balance competing foreign interests. When there is any doubt, national interests will tend to be favored over foreign interests.” Laker Airways, Ltd. v. Sabena, Belgian World Airlines, 235 U. S. App. D. C. 207, 249, 731 F. 2d 909, 951 (1984) (footnotes omitted); see also In re Uranium Antitrust Litigation, 480 F. Supp. 1138, 1148 (ND Ill. 1979).

 The Department of State in general does not transmit diplomatic notes from foreign governments to state or federal trial courts. In addition, it adheres to a policy that it does not take positions regarding, or participate in, litigation between private parties, unless required to do so by applicable law. See Oxman, The Choice Between Direct Discovery and Other Means of Obtaining Evidence Abroad: The Impact of the Hague Evidence Convention, 37 U. Miami L. Rev. 733, 748, n. 39 (1983).

 See Kerr v. United States District Court, 426 U. S. 394, 402-405 (1976); see also Boreri v. Fiat S. P. A., 763 F. 2d 17, 20 (CA1 1985) (refusing to review on interlocutory appeal District Court order involving extraterritorial discovery).

 See, e. g., Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U. S. 614, 630 (1985); Scherk v. Alberto-Culver Co., 417 U. S. 506, 516-519 (1974); The Bremen v. Zapata Off-Shore Co., 407 U. S. 1, 12-14 (1972).

 See, e. g., Romero v. International Terminal Operating Co., 358 U. S. 354, 382-384 (1959); Lauritzen v. Larsen, 345 U. S. 571, 577-582 (1953); Berizzi Bros. Co. v. The Pesaro, 271 U. S. 562, 575 (1926); Wildenhus’s Case, 120 U. S. 1, 12 (1887); The Belgenland, 114 U. S. 355, 363-364 (1885); The Scotia, 14 Wall. 170, 187-188 (1872); Brown v. Duchesne, 19 How. 183, 198 (1857); The Schooner Exchange v. McFaddon, 7 Cranch 116, 137 (1812).

 See, e. g., First National City Bank v. Banco Para el Comercio Exterior de Cuba, 462 U. S. 611, 626-627 (1983) (presumption that for purposes of sovereign immunity “government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such” on the basis of respect for “principles of comity between nations”).

 Justice Story used the phrase “comity of nations” to “express the true foundation and extent of the obligation of the laws of one nation within the territories of another.” § 38. “The true foundation on which the administration of international law must rest is, that the rules which are to govern are those which arise from mutual interest and utility, from a sense of the inconveniences which would result from a contrary doctrine, and from a sort of moral necessity to do justice, in order that justice may be done to us in return.” §35.

 Choice-of-law decisions similarly reflect the needs of the system as a whole as well as the concerns of the forums with an interest in the controversy. “Probably the most important function of choice-of-law rules is to make the interstate and international systems work well. Choice-of-law *556 rules, among other things, should seek to further harmonious relations between states and to facilitate commercial intercourse between them. In formulating rules of choice of law, a state should have regard for the needs and policies of other states and of the community of states.” Restatement (Second) of Conflict of Laws § 6, Comment d, p. 13 (1971).

 Chief Justice Marshall articulated the American formulation of this principle in The Schooner Exchange v. McFaddon, 7 Cranch, at 136:
“The jurisdiction of the nation within its own territory is necessarily exclusive and absolute. It is susceptible of no limitation not imposed by itself. Any restriction upon it, deriving validity from an external source, would imply a diminution of its sovereignty to the extent of the restriction ....
“All exceptions, therefore, to the full and complete power of a nation within its own territories, must be traced up to the consent of the nation itself. They can flow from no other legitimate source.”

 Many of the nations that participated in drafting the Convention regard nonjudicial evidence taking from even a willing witness as a violation of sovereignty. A questionnaire circulated to participating governments prior to the negotiations contained the question, “Is there in your State any legal provision or any official practice, based on concepts of sovereignty or public policy, preventing the taking of voluntary testimony for use in a foreign court without passing through the courts of your State?” Questionnaire on the Taking of Evidence Abroad, with Annexes, Actes et documents 9, 10. Of the 20 replies, 8 Governments — Egypt, France, West Germany, Italy, Luxembourg, Norway, Switzerland, and Turkey-stated that they did have objections to unauthorized evidence taking. Réponses des Gouvernements au Questionnaire sur la réception des déposi-tions á l’étranger, Actes et documents 21-46; see also Oxman, 37 U. Miami L. Rev., at 764, n. 84.

 The Federal Republic of Germany, in its diplomatic protests to the United States, has emphasized the constitutional basis of the rights violated by American discovery orders. See, e. g., Diplomatic Note, dated Apr. 8, 1986, from the Embassy of the Federal Republic of Germany. App. A to Brief for Federal Republic of Germany as Amicus Curiae 20a.

 See Edwards, Taking of Evidence Abroad in Civil or Commercial Matters, 18 Int’l & Comp. L. Q. 618, 647 (1969). A number of countries that ratified the Convention also expressed fears that the taking of evidence by-consuls or commissioners could lead to abuse. Ibid.

 According to the French Government, the overwhelming majority of discovery requests by American litigants are “satisfied willingly. . . before consular officials and, occasionally, commissioners, and without the need for involvement by a French court or use of its coercive powers.” Brief for Republic of France as Amicus Curiae 24. Once a United States court in which an action is pending issues an order designating a diplomatic or consular official of the United States stationed in Paris to take evidence, oral examination of American parties or witnesses may proceed. If evidence is sought from French nationals or other non-Americans, or if a commissioner has been named pursuant to Article 17 of the Convention, the Civil Division of International Judicial Assistance of the Ministry of Justice must authorize the discovery. The United States Embassy will obtain authorization at no charge or a party may make the request directly to the Civil Division. Authorization is granted routinely and, when necessary, has been obtained within one to two days. Brief, at 25.

 For example, after the filing of the initial pleadings in a German court, the judge determines what evidence should be taken and who conducts the taking of evidence at various hearings. See, e. g., Langbein, The German Advantage in Civil Procedure, 52 U. Chi. L. Rev. 823, 826-828 (1985). All these proceedings are part of the “trial,” which is not viewed as a separate proceeding distinct from the rest of the suit. Id., at 826.

 “In most common law countries, even England, one must often look hard to find the resemblances between pre-trial discovery there and pretrial discovery in the U. S. In England, for example, although document discovery is available, depositions do not exist, interrogatories have strictly limited use, and discovery as to third parties is not generally allowed.” S. Seidel, Extraterritorial Discovery in International Litigation 24 (1984).

 In France, the Nouveau Code de Procédure Civile, Arts. 736-748 (76th ed. Dalloz 1984), implements the Convention by permitting examination and cross-examination of witnesses by the parties and their attorneys, Art. 740, permitting a foreign judge to attend the proceedings, Art. 741, and authorizing the preparation of a verbatim transcript of the questions and answers at the expense of the requesting authority, Arts. 739, 748. German procedures are described in Shemanski, Obtaining Evidence in the Federal Republic of Germany: The Impact of The Hague Evidence Convention on German-American Judicial Cooperation, 17 Int’l Lawyer 465, 473-474 (1983).

 The United States recounts the time and money expended by the SEC in attempting to use the Convention’s procedures to secure documents and testimony from third-party witnesses residing in England, France, Italy, and Guernsey to enforce the federal securities laws’ insider-trading provisions. See Brief for United States and Securities and Exchange Commission as Amici Curiae 15-18. As the United States admits, however, *562 the experience of a governmental agency bringing an enforcement suit is “atypical” and has little relevance for the use of the Convention in disputes between private parties. In fact, according to the State Department, private plaintiffs “have found resort to the Convention more successful.” Id., at 18.
The SEC’s attempts to use the Convention have raised questions of first impression, whose resolution in foreign courts has led to delays in particular litigation. For example, in In re Testimony of Constandi Nasser, Trib. Admin, de Paris, 6eme section — 2éme chambre, No. 51546/6 (Dec. 17,1985), the French Ministry of Justice approved expeditiously the SEC’s letter of request for testimony of a nonparty witness. The witness then raised a collateral attack, arguing that the SEC’s requests were administrative and therefore outside the scope of the Convention, which is limited by its terms to “civil or commercial matters.” The Ministry of Justice ruled against the attack and, on review, the French Administrative Court ruled in favor of the French Government and the SEC. By then, however, the SEC was in the process of settling the underlying litigation and did not seek further action on the letter of request. See Reply Brief for Petitioners 17, and nn. 35, 36.

 The use of the term “pre-trial” seems likely to have been the product of a lack of communication. According to the United States delegates’ report, at a meeting of the Special Commission on the Operation of the Evidence Convention held in 1978, delegates from civil-law countries revealed a “gross misunderstanding” of the meaning of “pre-trial discovery,” thinking that it is something used before the institution of a suit to search for evidence that would lead to litigation. Report of the United States Delegation, 17 Int’l Legal Materials 1417, 1421 (1978). This misunderstanding is evidenced by the explanation of a French commentator that the “pretrial discovery” exception was a reinforcement of the rule in Article 1 of the Convention that a letter of request “shall not be used to obtain evidence which is not intended for use in judicial proceedings, commenced or contemplated” and by his comment that the Article 23 exception referred to *564 the collection of evidence in advance of litigation. Gouguenheim, Convention sur l’obtention des preuves á l’étranger en matiére civile et com-merciale, 96 Journal du Droit International 315, 319 (1969).

 France has recently modified its declaration as follows:
“The declaration made by the Republic of France pursuant to Article 23 relating to letters of request whose purpose is ‘pre-trial discovery of documents’ does not apply so long as the requested documents are limitatively enumerated in the letter of request and have a direct and clear nexus with the subject matter of the litigation.”
“La declaration faite par la République frangaise conformément á Particle 23 relatif aux commissions rogatoires qui ont pour objet la procédure de ‘pre-trial discovery of documents’ ne s’applique pas lorsque les documents demandés sont limitativement énumérés dans la commission rogatoire et ont un lien direct et précis avec l’objet du litige.” Letter from J. B. Rai-mond, Minister of Foreign Affairs, France, to H. H. van den Broek, Minister of Foreign Affairs, The Netherlands (Dec. 24, 1986).
The Danish declaration is more typical:
“The declaration made by the Kingdom of Denmark in accordance with article 23 concerning ‘Letters of Request issued for the purpose of obtaining pre-trial discovery of documents’ shall apply to any Letter of Request which requires a person:
“a) to state what doeuments.relevant to the proceedings to which the Letter of Request relates are, or have been, in his possession, other than particular documents specified in the Letter of Request;
“or
“b) to produce any documents other than particular documents which are specified in the Letter of Request, and which are likely to be in his possession.” Declaration of July 23, 1980, 7 Martindale-Hubbell Law Directory (pt. VII) 15 (1986).
The Federal Republic of Germany, Italy, Luxembourg, and Portugal continue to have unqualified Article 23 declarations, id., at 16-18, but the German Government has drafted new regulations that would “permit pretrial production of specified and relevant documents in response to letters of request.” Brief for Anschuetz & Co. GmbH and Messerschmitt-Boelkow-Blohm GmbH as Amici Curiae 21.

 An Article 23 reservation and, in fact, the Convention in general require an American court to give closer scrutiny to the evidence requested than is normal in United States discovery, but this is not inconsistent with recent amendments to the Federal Rules of Civil Procedure that provide for a more active role on the part of the trial judge as a means of limiting discovery abuse. See Fed. Rule Civ. Proc. 26(b), (f), and (g) and accompanying Advisory Committee Notes.